## ORWIG v. MERRILL ET AL.

1. **Trust:** IMPLIED: ABSOLUTE CONVEYANCE INCONSISTENT WITH. Parties who take under an absolute deed, where it is shown that the grantor and grantees alike understood the deed to be absolute, cannot be held as trustees simply because the grantor was embarrassed when he made the conveyance, and a third person told him that if he would convey to the grantees they would deal honorably with him, and, on account of a great rise in values, the grantees sold the property within a few years at a considerable advance.

2. ——: ——: CONVEYANCE PROCURED BY FRAUD: EVIDENCE. The evidence considered (see opinion) and *held* that there was nothing in the mental condition of the grantor, nor in representations made to him by the authority of the grantees, nor in the inadequacy of the price paid, to show that the deed in question was obtained by fraud.

3. **Fraudulent Conveyance:** EVIDENCE. Although the grantor in this case was insolvent when the deed in question was made, and may have entertained a secret hope of saving something which would be beyond the reach of his creditors, yet, as there is no evidence that his grantees knew of his insolvent condition, and as the price which they paid for the property conveyed was not much less than its actual market value at the time of the conveyance, *held* that there was nothing to taint the transaction with a suspicion that it was done with the intention to delay or defraud the creditors.

*Appeal from Polk Circuit Court.*

THURSDAY, APRIL 22, 1886.

ACTION in equity for an accounting in respect to certain alleged trust property. C. B. Jones intervened. There was a decree for the defendant. The plaintiff and intervenor appealed.

*R. G. Orwig*, for himself, appellant.

*Baylies & Baylies*, for intervenor, appellant.

*Mitchell & Dudley* and *Gatch, Connor & Weaver*, for appellees.

ADAMS, CH. J.—This action was brought by S. F. Spofford. He died, and the plaintiff, R. G. Orwig, having been

1. TRUST: im- appointed administrator of his estate, was
plied: abso-
lute convey- substituted. In 1879 Spofford conveyed to
ance incon-
sistent with. the defendants A. Lederer and Moses Strauss a large amount of real estate in the city of Des Moines. What its value was is one of the questions deemed material, but in regard to which the witnesses differed widely. It is sufficient for our present purpose for us to say that in their estimates they range generally from about $15,000 to about $40,000. The consideration which Lederer & Strauss claim that they were to pay was a little less than $14,000. The principal question presented is as to the character of the transaction in which the conveyance was made. The plaintiff claims that they took the property in trust, and the defendants deny the trust, and aver that they took it by absolute purchase. The property has, since the conveyance to the defendants, been sold by them for about $30,000, and the plaintiff asks that they and the defendants J. H. Merrill and J. G. Rounds, who became associated with

Lederer & Strauss, be held to account for the amount realized in excess of the amount paid.

The averments of the petition designed to show the character of the transaction are somewhat peculiar. The property was considerably incumbered by liens. The petition, after setting out this fact, avers, in substance, that Lederer & Strauss agreed to advance money to pay all the lien creditors except one, and avers that the "defendant further promised that they would have due care for his (the said Spofford's) interest, and that they would deal honorably with him. It is nowhere distinctly averred that Spofford agreed to convey, and did convey, the property to Lederer & Strauss as security for advances to be made by them, or in trust to be sold by them; nor is it averred that they agreed, if it should be sold, to account for any part of the proceeds of sales. On the other hand, it is averred that Spofford "did, in good faith, waive all legal title, right and claim;" and, consistently with this averment, Spofford testified: "I did not understand or expect that the terms on which my property was deeded to Lederer & Strauss created a legal obligation to pay me the excess of sales over and above my debts referred to. I expected that Lederer & Strauss would, according to their promise then made, deal honorably with me in regard to such excess, and that was the reason I waived all legal claim against them." He admitted that after the sales by Lederer & Strauss a conversation occurred between him and Lederer in these words: "Lederer said: 'Do we owe you anything?' I replied: 'Not legally, but morally you do.'" In a deposition taken in another proceeding Spofford said: "I deeded the property to them without reservations. There was no understanding between me and Lederer & Strauss that they were to pay me something if they made a good thing out of the property. I was glad to let them have it, and get my debts paid. I did not make any estimate of my property; it would do no good. It was gone, so far as I was concerned." Strauss, who

negotiated the purchase for Lederer & Strauss, denies that there was any conversation between them about dealing honorably with Spofford. We cannot say then, that even that fact is established. It is true that Spofford testified again and again that the defendant Samuel Merrill told him that Lederer & Strauss would deal honorably with him, and the counsel for the plaintiff comment upon this testimony as if they deemed it of controlling importance. It has, of course, no importance.

So far, then, as the character of the deed is concerned, we have to say this: It purports to make an absolute conveyance. The petition shows that it was designed by both parties as such cenveyance, and Lederer, Strauss and Spofford all testify to the same effect. This is as inconsistent with a secret reservation as a reservation expressed. We must, then treat the deed as absolute, unless it was obtained by fraud.

The petition contains an averment in these words: "The promise and agreement of the petitioner to waive all legal

2. ——: ——: claim against defendant, as also the management
conveyance
procured by   and control of the petitioner's said estate, was so
fraud: evi-
dence.       obtained by fraud of said defendants." But we are unable to discover a single allegation of fact in the petition which should be necessarily construed as showing fraud. It is averred that Spofford was seventy-three years old, but there is no averment that he was imbecile, and no pretense that he was. On the other hand, it is shown that he was one of the directors of the Citizens' National Bank. Much is said in the petition about the reliance placed by Spofford upon the defendant Samuel Merrill as his confidential adviser, and about the advice which Merrill gave, but we see nothing fraudulent in the advice, and even if there had been, Lederer & Strauss could not be affected by it. Merrill did not represent them in any form, and had no interest in the purchase. Much is said in the petition about the value of the real estate as compared with what Lederer & Strauss agreed to pay; but no means were used to deceive Spofford

in regard to its value. He traded with his eyes open. What is more, the agreed price is but a little less than the value, as estimated by some witnesses. It is true that others estimated the value much higher; but after the conveyance in question real estate in Des Moines, as the evidence shows, rose greatly in value. Within three or four years the future growth of Des Moines became assured. Capitalists, as well as others, acquired confidence in it. Now the testimony of all the witnesses was given after this change, and can hardly be presumed to have been wholly free from its influence. Much is said in respect to the amount which Lederer & Strauss obtained for the property; but that is wholly immaterial, so far as the question is concerned as to whether Lederer & Strauss deceived Spofford, or gained in any way a fraudulent advantage over him. They bought when Des Moines real estate was low, and sold when it was high. We cannot discuss all the considerations which are urged as showing that Lederer & Strauss obtained the conveyance by fraud. It is sufficient to say that we do not think that such fraud is shown either by the plaintiff's petition or the evidence.

One more question of fraud is raised which we will dispose of in this connection. The intervenor, one of Spofford's creditors, contends that Spofford and Lederer & Strauss combined to defraud Spofford's creditors.

3. FRAUDULENT conveyance: evidence. His position is that while the conveyance was made in terms importing an absolute conveyance, and with the intention of representing it to be such, there was, in fact, a secret understanding that an interest was reserved to Spofford. Upon this point we have to say that the evidence leads us to suspect that Spofford did have a hope of saving something which his creditors could not reach; but we do not think that he based his hope upon any *agreement* that an interest was reserved to him. His own testimony shows that he did not. His hope seems to have been based upon what he claims that Gov. Merrill said to him; and that is, that Lederer & Strauss would deal honorably with him. What, precisely, Gov. Merrill

meant, if he said that, we do not know, nor is it important to inquire. We only allude to it as affording what seems to be a probable solution of this matter. We are inclined to think that Spofford was influenced by something said to him by Gov. Merrill to believe that Lederer & Strauss would, if they sold the property at an advance, give him something which they did not promise to give him; but we do not feel justified by the evidence in saying more than that. If we could believe that the property at the time Spofford parted with the title was worth what some of the witnesses testify that it was, that would be an important circumstance. It would affect with suspicion the whole transaction. According to their testimony, the property was worth about $40,000; but their testimony is so completely rebutted that it is impossible to place much confidence in the judgment of the witnesses. The only question, of course, was as to what the market value of the property was at that time; that is, as to what the property could have been sold for at that time. Now, if the property could have been sold for $40,000, Spofford was abundantly solvent. Indeed, according to his own estimate of his indebtedness at that time, his assets, if some of his witnesses could be relied upon, were treble his indebtedness. Yet the fact is, he regarded himself as embarrassed. This is undisputed. He admitted that his property would not sell for enough to pay the liens on it. This shows what his idea was in regard to the market value of the property. Another fact is to be considered, and that is that the property, though sold after a most remarkable rise, realized only about three-fourths as much as the extravagant witnesses estimated it to be worth before the rise. These witnesses, then, were manifestly not testifying in regard to market value, but in regard to something else, and nothing more need be said to show of how little value their testimony is. The defendant's witnesses did not differ much from each other, and their average estimate was a little over $17,000. Possibly, their estimates were not quite high enough, but the result of

the sale made after the rise indicates that it did not lack much of it.

The fact, then, seems to be that Lederer & Strauss, in purchasing at the price at which they did, made simply a good trade, but not an extraordinary one. Such being the case, we cannot say that the value of the bargain was such as to greatly affect the transaction with suspicion. On the other hand, it does not appear that they knew that Spofford was insolvent. They knew pretty nearly what assets he had. They knew pretty nearly what he owed, with the exception of one debt, and of that they appear to have been ignorant, and but for that debt Spofford would not have been insolvent. We think that they did not know, nor have reason to suppose, that he was insolvent. Some other circumstances are relied upon as tending to show fraud upon their part, but we have to say that we think that they are insufficient.

It remains to be stated that this action was brought, in part, to obtain an accounting in respect to certain collaterals which at one time had belonged to Spofford, and had by him been delivered to the defendant Rounds as cashier of the defendant the Citizens' National Bank. The transactions between Spofford and the bank, in which these collaterals were more or less involved, seem to have become very complicated, and, on some points, misunderstandings seem to have arisen. A settlement, however, was finally effected between Spofford and Gov. Merrill, who was the president of the bank. According to the evidence, we think a complete understanding was not reached, and that the settlement was in the nature of a compromise. Gov. Merrill so testified, and we see no reason to believe that his testimony is not correct. A receipt was drawn and signed by Spofford, running to Rounds, in whose hands, as cashier of the bank, the collaterals had been placed. That receipt is as follows:

" Received of J. G. Rounds full and complete satisfaction for certain notes and stock which I left with him for collec-

tion and sale, to-wit, John Gannon, several notes secured by mortgage, amounting to about twenty-seven hundred dollars, and bank stock of Citizens' National Bank, being thirteen shares. This property was left with said Rounds in trust, and for conversion into money for certain debts that I was owing. This trust has been performed to my satisfaction, and this settlement is in full for all and every claim to date, March 13, 1883.

[Signed]                                        " S. F. SPOFFORD."

The plaintiff now seeks to go behind this settlement. It is said that Spofford supposed that the money realized from collaterals had been used for his benefit, which had not been so used. Spofford testified, in substance, that he supposed the money was used in discharing liens upon the land sold to Lederer & Strauss; but, as between him and Lederer & Strauss, he was not to discharge these liens, and so his testimony in regard to his supposition seems to be incredible. It is possible that justice was not done in the settlement. When transactions become complicated and misunderstood, and parties resort to compromise, it is not to be supposed that exact justice is done to both parties. But we have gone carefully through the evidence and arguments of counsel for plaintiff and intervenor, which are unusually voluminous, and we have to say that we do not see that any unfair advantage was taken.

In our opinion the settlement must stand, and in all respects the decree of the circuit court shuold be

AFFIRMED.